**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:25-CR-00475-TRJ-1 |
| | ) | |
| DAVID BRADFORD, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT DAVID BRADFORD'S SENTENCING MEMORANDUM, OBJECTIONS TO PSR, AND REQUEST FOR SENTENCING VARIANCE**

Defendant David Bradford, by and through undersigned counsel, respectfully submits this memorandum to provide information to assist the Court with fashioning its sentence in this case. Given all the relevant circumstances, we respectfully submit that a sentence of 40 months would be "sufficient but not greater than necessary" to comport with the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## I. Initial Statement and Background

Two frauds took place at Drive Planning – one involving the Cash Out Real Estate ("CORE") fund and the other involving the Real Estate Acceleration Loan ("REAL") fund. Mr. Bradford was a knowing participant in the CORE fund fraud where investor money was supposed to go to a third party (R.I.) for further investment relating to tax deed purchases. Much of the money collected by Drive Planning did not go to this third party, the money that was invested did not earn the promised returns, victims were misled and suffered losses. Mr. Bradford has pled guilty to his role in this fraud.

Mr. Bradford, however, was not a knowing participant in the much larger REAL fund fraud. Rather, he and his family are among many investors who lost money in REAL. The government agrees Mr. Bradford was not a knowing participant in that fraud and reached this conclusion, in part, because of a five-to-six-hour proffer session investigators had with him wherein he was found to be credible and honest.

Mr. Bradford presents two material objections to the Final PSR. His objections show that the loss amount is overstated and that five or more CORE fund victims who suffered substantial financial hardship have not been identified. When those objections are addressed, the Total Offense Level will be 25 (57-71 months).

Mr. Bradford provided substantial assistance in this investigation which resulted in guilty pleas from two other individuals. The government will file a motion recommending a downward adjustment pursuant to Section 5K1.1.

There are compelling facts and arguments for a downward variance. Mr. Bradford has exhibited "credible accountability"—without being prodded by regulators or law enforcement. Albeit late, he tried to stop the harm being caused. He resigned from Drive Planning and immediately began to turnover assets for the benefit of all victims. He is the only individual who entered into a voluntary asset turnover agreement with the Receiver, the only individual who returned their legal fee advancement, and was the first to agree to a consent judgment with the SEC.

Full restitution is a real possibility. A third party holds funds belonging to the CORE investors, as well as a large investment made by Mr. Bradford. There was also a segregated Drive Planning bank account that held CORE investor money. (PSR ¶¶

11 and 98) The government is now making inquiry as to whether funds were in that account when Drive Planning shut down. Finally, the Receiver will soon be making distributions to victims.

## II. Governing Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court restored the district court's power to fashion a sentence tailored to the individual circumstances of the case and the individual defendant. The advisory Sentencing Guidelines "are not only *not mandatory* on sentencing courts; they also are not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original); *see also Rita v. United States*, 551 U.S. 338, 351 (2007). Other relevant factors in determining the appropriate sentence include "the nature and circumstances of the offense" and the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the need to advance sentencing purposes of punishment and deterrence, *id.* § 3553(a)(2), "the kinds of sentences available," *id.* § 3553(a)(3), "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6), and "the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7).

The directive for this Court is to "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). A sentencing court must "consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support a sentence requested by a party," *Gall v. United States*, 552 U.S. 38, 49 (2007), including arguments that the Guideline sentence should not apply

on general policy grounds, case-specific grounds, or just "because the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

## III. Nature of the Offense and Characteristics of Defendant

Mr. Bradford pleaded guilty to, and he accepts full responsibility for, his crime of conspiracy to commit wire fraud related to the CORE fund. He is currently 53 years old. He obtained his undergraduate degree from Wofford College in Spartanburg, South Carolina and a Master of Divinity from Westminster Theological Seminary. He previously lived in Savannah, Georgia, where he served as a pastor at a Presbyterian Church. Mr. Bradford's life was turned upside down when his first wife left him and his five biological children. After his first wife left him, Mr. Bradford was granted full custody of his children and left Savannah to start his life over. After a period of struggle, he eventually ended up in the Atlanta, Georgia area. It was there that he met Todd Burkhalter through a church group and began working for Drive Planning.

Mr. Bradford has six children, five biological and one adopted. He was described in the PSR by his current wife as a "good-hearted person" who stepped in to adopt her son after his biological father gave up his parental rights to avoid having to pay monthly child support. Other family and friends have remarked that Mr. Bradford is an individual who has a "sincerity of [] faith and [a] genuine care for the

people in his life," that seeks to do the "right thing, even and especially when it's hard," that has "good intentions," "who wants good for others" and that "has strong gifts in service and development." (*See* Letters in Support attached as Exhibit 1). These friends and family members have also remarked that Mr. Bradford is extremely remorseful for his conduct in this case, and that they believe he has a lot to contribute to society going forward.

Mr. Bradford understands that he has pled guilty to a serious crime. He is extremely remorseful for his conduct. He voluntarily turned over assets—having an estimated value of $10 million to help repay the victims of the CORE and REAL fund frauds. All he can do is continue to try and make things right the best he can going forward.

Prior to this case, Mr. Bradford had no criminal history and had never been in trouble with the law. Of significance is that Judge Bly determined there was no need for Mr. Bradford to have pretrial supervision. Mr. Bradford's risk of recidivism is extremely low. On March 9, 2017, the Sentencing Commission published *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*. (located at https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders). The Commission studied the criminal history categories and recidivism of federal offenders, examining 25,431 offenders who were either released from prison or placed on probation in 2005.

This report supports the conclusion that Mr. Bradford's risk of recidivism is extremely low. Consistent with previous studies, the Commission found that

recidivism rates are closely correlated with total criminal history points and resulting Criminal History Category classification, as offenders with lower criminal history scores have lower recidivism rates than offenders with higher criminal history scores. The Commission specifically found that offenders with zero points and no prior contact with the criminal justice system have a lower recidivism rate (25.7%) than offenders with zero points but some prior contact with the criminal justice system (37.4%). (*The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at "Report Highlights," https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders). Mr. Bradford has had no contact with the criminal justice system until now. In short, studies conducted by the Sentencing Commission illustrate that Mr. Bradford poses a low-level risk of recidivating; consequently, a below guideline sentence does not pose a risk of danger to the public.

Mr. Bradford understands that punishment and deterrence are valid considerations for this Court in setting his sentence. However, several circumstances of Mr. Bradford's case demonstrate that these purposes may be justly served with a sentence of 40 months. As stated above, Mr. Bradford has no criminal history whatsoever. He does not, and has never, abused drugs or alcohol. In this regard, the Court should take into account that Mr. Bradford will not be a candidate for RDAP. That means he will not be eligible to participate in a nine-month treatment program and have BOP reduce his sentence by up to 12 months.

How Mr. Bradford responded to his self-created situation demonstrates his understanding of the significance of his criminal acts and his efforts to turn away from them. Mr. Bradford voluntarily turned over assets to the Receiver, entered into a consent judgment with the SEC, voluntarily pled guilty to his role in this case, and cooperated with the government into the investigation of others. Indeed, he is the only one who took responsibility for his actions and cooperated truthfully with the government. He waived indictment before a grand jury, he did not require the government to engage in any extensive discovery practice, and he filed no contentious motions. He stood before this Court and clearly and articulately admitted his guilt. Everything about his response to this case reflects that it was an aberrant step, not a stop on a path to being a career criminal.

## IV. Bradford Objects to the Loss Amount Finding Set Forth in Paragraphs 175 and 182 and Alternatively Shows that a Downward Variance is Warranted

### A. The Net Loss Set Forth in Paragraph 182 is Overstated

Mr. Bradford pled guilty on December 16, 2025, and agreed with the government in his plea agreement that the loss (for purposes of the advisory Sentencing Guidelines) was greater than $3.5 million but less than $9.5 million which resulted in an increase of 18 levels pursuant to the loss table set forth at Section 2B1.1(b)(1) of the Sentencing Guidelines. At that time, the government understood that the loss incurred by CORE investors was $4,693,377. In fact, that was the same loss amount referenced in the Initial PSR at Paragraph 32. The government, however, recently provided an updated loss calculation which concludes that the net

loss is $4,297,878. (Final PSR ¶ 32)[1] This disclosure changes the analysis. The applicable loss amount now falls below $3.5 million.

CORE fund investors understood that their money would be forwarded to a third party who would then invest/utilize this money. Here, the third party was R.I. At the time of Drive Planning's collapse in June 2024, R.I. held CORE investor money totaling $1.186 million. (PSR ¶ 151) Counsel recently spoke to D.P., a principal of R.I., who confirmed that R.I. still has these funds. No one has asked R.I. to return these funds. Counsel has informed the government about this situation. Not only should the funds held by R.I. be used for restitution, but also this money (which actually went where it was supposed to go) should act to reduce the net loss to $3,111,878 ($4,297,878 - $1,186,000 = $3,111,878). When that is done, the offense level increase will be 16 since the loss amount is between $1.5 and $3.5 million.[2]

B. Alternatively, the Amendment to the Section 2B1.1 Loss Table Warrants a Downward Variance

On April 16, 2026, the U.S. Sentencing Commission voted unanimously to amend the § 2B1.1 loss table to restructure the table by adjusting the monetary values for each tier. See https://www.ussc.gov/about/news/press-releases/april-16-2026.[3] These adjustments are set to take effect on November 1. The amended loss

---

[1] Section 2B1.1, Application Note 3(E)(iv) instructs that net loss is to be used except where the payment to an investor is in excess of that investor's principal investment.

[2] This argument, of course, could not have been made when the loss amount was deemed to be $4,693,377. Moreover, this net loss could be reduced further depending on what the government's inquiry determines with respect to whether the segregated bank account for CORE investors had a balance as of June 2024.

[3] *See also*, 90 FR 39263 (Aug. 14, 2025) – subsection (3) ("to ensure the guidelines appropriately reflect the culpability of the individual and the harm to the victims")

table is attached as Exhibit 2. Significantly, this amended loss table instructs that a loss amount of more than $2 million but less than $5 million warrants only a 16-level loss enhancement. So, if Mr. Bradford were being sentenced after the amendment goes into effect (less than three months from now), his Total Offense Level would be two levels lower. To account for this timing issue, the Court should apply a two-level downward variance.

Mr. Bradford's request for this two-level downward variance is not a novel one. In at least three recent cases, according to the defense counsel involved in those cases, Judges in this District have granted downward variance requests to account for the new loss table that will be effective on November 1. *United States v. Shull*, 1:25-CR-29-JPB; *United States v. Williams*, 1:25-CR-68-VMC; *United States v. Barry*, 1:21-cr-385-ELR-5.[4]

## V. Bradford Objects to the Finding that the Offense Caused Substantial Financial Hardship to Five or More Victims

Paragraph 183 of the PSR is an unresolved guideline issue. It concludes that Paragraph 77 identifies six CORE fund victims who suffered substantial financial hardship. Upon closer examination, however, there are only four such victims. As to the other two identified victims, one was not a CORE fund investor and the other does not meet any of the factors used to make this hardship determination.

Application Note 4(F) of Section 2B1.1 provides:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—

[4] *See also*, Exhibit 3, Law 360 Article.

(i) becoming insolvent;

(ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);

(iii) suffering substantial loss of a retirement, education, or other savings or investment fund;

(iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;

(v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

(vi) suffering substantial harm to his or her ability to obtain credit.

Paragraph 183 identifies H.E. (¶ 77(c)) as being a CORE fund investor who suffered substantial financial hardship. But H.E. is not listed in Paragraph 32, which lists all of the CORE fund investors.

Paragraph 183 identifies M.E. (¶ 77(m)) as being a CORE fund investor who suffered substantial financial hardship. M.E. is listed in Paragraph 32 as a CORE fund investor who suffered a net loss. The issue, however, is that there is no information in the PSR which shows that this victim suffered any of the ramifications set forth in Application Note 4(F).

There being less than five victims who suffered substantial financial hardship, Mr. Bradford objects to the four-level enhancement. Only a two-level enhancement is warranted since the offense involved more than 10 victims.

We note here that even a single victim who suffered substantial financial hardship affects Mr. Bradford's advisory guidelines sentence in a different way since that eliminates his eligibility for a two-level reduction under Section 4C1.1 (Zero

Point Offender).

## VI. Factors That Warrant Downward Adjustments/Variances

### A. The Government Agrees: Mr. Bradford Provided Substantial Assistance in the Government's Investigation

The government will file a motion recommending a downward adjustment pursuant to Section 5K1.1. We, of course, agree that this request is warranted but believe this downward adjustment should be more than one level/six months.

Mr. Bradford was the first—and remains the only—individual in this investigation to proactively cooperate with the government. His cooperation was substantive and consequential: he provided a candid multi-hour proffer, produced documents directly implicating Burkhalter and Edwards in both the REAL and CORE schemes, and through counsel actively assisted the government by presenting facts and documents to Mr. Burkhalter's counsel in a way that we believe materially contributed to Burkhalter's decision to plead guilty. Julie Edwards' plea followed. Mr. Bradford drove this domino effect at a time when every other relevant individual had declined to cooperate.

Counsel informed the government in August 2025 that Mr. Bradford was ready to move forward with a guilty plea relating to the CORE fund and stressed that Mr. Bradford maintained he was not a knowing participant in the REAL Ponzi scheme. At that time, no one believed Todd Burkhalter would resolve his case with a guilty plea. All believed he was going to trial.

In October 2025, Mr. Bradford gave a five-to-six-hour proffer. At its conclusion, the investigating team told Mr. Bradford they found him honest and credible and that

the Section 371 plea would move forward.

Mr. Bradford's cooperation during the proffer was substantive on three fronts: First, he identified the numerous instances in which Burkhalter definitively lied about REAL, and he explained how Edwards was present during these misrepresentations, necessarily knew they were false, and never alerted Mr. Bradford or others.

Second, Mr. Bradford answered all of the FBI's questions regarding a third individual, while being candid that he did not tell this individual about CORE and could not identify facts tying this individual to the CORE scheme. Third, and most significantly, Mr. Bradford produced documents during the proffer establishing the knowing involvement of Burkhalter and Edwards in the CORE fund scheme. These included text exchanges between him and Burkhalter showing a purposeful diversion of CORE funds at a time when little to no profits were being generated, and a text exchange with Edwards demonstrating that she was aware Burkhalter was diverting funds and told no one.

At Mr. Bradford's direction, counsel met with counsel for Burkhalter to show how Mr. Bradford's cooperation, documents and potential testimony would support a conviction. Our assessment is that the information Mr. Bradford directed be shared materially influenced Burkhalter's decision to plead guilty less than two months later.

At Mr. Bradford’s direction, counsel also communicated with Julie Edwards’ counsel. We cannot say with certainty that this communication drove her decision to

plead, but Edwards pled after Burkhalter pled, and Mr. Bradford's cooperation was a direct cause of Burkhalter's plea. We believe Mr. Bradford deserves credit for this domino effect.

Mr. Bradford’s cooperation was strong and substantial and, without a doubt, helped the government to resolve quickly this entire matter. A two-level downward adjustment is warranted.

B. The Court Should Adjust Downward Based on the Credible Accountability Exhibited by Bradford.

There are other compelling facts and arguments for downward variance. Among those arguments is the “credible accountability” exhibited by Mr. Bradford—without prodding from regulators or law enforcement. Before Drive Planning collapsed in June 2024, Mr. Bradford tried to stop the harm being caused. He tried to stop Todd Burkhalter from paying commissions to the salesforce. (PSR ¶ 173) Mr. Bradford personally made sure he did not receive any commission payments after trying to stop Burkhalter by refusing to submit the required paperwork. Instead, he resigned from Drive Planning and immediately tried to turnover his interest in two properties—first through counsel for Drive Planning and then the SEC, but was not successful until a Receiver was appointed in August 2024.

The Court will note from the PSR that Mr. Bradford has a negative net worth. (PSR ¶ 225) This is because Mr. Bradford is the only individual who entered into a voluntary asset turnover agreement with the Receiver. This was for the benefit of all Drive Planning victims. That asset transfer has an estimated value of $10 million,

and included cash, real estate, investments, and the cash value of life insurance policies.

Four individuals received legal fee advances from Drive Planning. Mr. Bradford was the only one who returned that money—again, for the benefit of all Drive Planning victims. Mr. Bradford was also the first individual to agree to a consent judgment with the SEC.

Full restitution for CORE fund victims is a real possibility. First, R.I. still retains and has been utilizing the $1.186 million it received from CORE fund investors—yet as of July 29, 2026, no one had asked R.I. to turn over this money. Second, there was a segregated CORE fund investor bank account at Drive Planning. (PSR ¶¶ 11 and 98) Any funds that were in that account as of June 2024 should be returned to those investors. Third, Mr. Bradford also invested with R.I. That $2–2.5 million investment is part of the voluntary asset turnover agreement. But R.I. still has control over this money. The Court may want to consider whether these funds should be used for restitution. Finally, there will soon be distributions to the victims by the Receiver.

C. <u>The Court Should Adjust Downward to Account for Mr. Bradford's Acceptance of Responsibility.</u>

The rationale presented in this section is only relevant if the Court finds that Mr. Bradford's total offense level is greater than 25.

In *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995), the Eleventh Circuit held that in instances where a defendant's advisory range falls above a statutory maximum, the sentencing court is authorized to depart downward to give

the defendant the benefit of acceptance of a responsibility reduction under U.S.S.G. § 3E1.1. *Rodriguez* was decided at a time that the Sentencing Guidelines were mandatory. There, the defendant argued that the sentencing judge had erred in not departing downward because his sentence would have been the same in that case had he not accepted responsibility (i.e., the statutory maximum). *Id.* at 643. Put differently, the defendant had lost all benefit associated with the acceptance of responsibility under the circumstances.

The *Rodriguez* court ultimately agreed, explaining that "[a] departure from the sentence proscribed by § 5G1.1(a) when the defendant's acceptance of responsibility has not been recognized is consistent with the goals of the guidelines." *Id.* The court further reasoned that "[a]llowing a departure based on acceptance of responsibility in such circumstances preserves the possibility of some sentencing lenience and thus serves society's legitimate interest in guilty pleas and plea bargaining." *Id.* at 643. Post-*Booker*, the sentencing court still maintains the discretion to reward acceptance of responsibility when the advisory range is above the statutory maximum by adjusting or departing downward. *See, e.g., United States v. Ramirez,* 2023 WL 3477811, at * 4 (11th Cir. May 16, 2023) (district court maintained discretion to calculate a departure or to vary downward from the advisory guideline range that was same as statutory max); *see also United States v. Blanco*, 102 F.4th 1153, 1159, 1167-68 (11th Cir. 2024).

The statutory maximum for the sole charge in this case is 60 months. Thus, according to § 5G1.1(a), 60 months is the guideline sentence so long as the advisory

range remains above 60 months. Under these circumstances, Mr. Bradford has effectively not received credit for acceptance of responsibility. But Mr. Bradford was the first Defendant in this case to plead guilty and accept responsibility. He voluntarily cooperated with investigators and turned over millions of dollars of assets without requiring the Receiver to file suit.

Given the above, the Court should exercise its discretion and adjust downward from 60 months to provide Mr. Bradford with the benefit of his acceptance of his responsibility.

## VII. Conclusion

The factors discussed herein, and those that additionally may be raised at the sentencing hearing, demonstrate that the Court should exercise its reasoned mercy and sentence Mr. Bradford to no more than 40 months.

Respectfully submitted, this 7th day of August, 2026.

**GRIFFIN DURHAM TANNER & CLARKSON LLC**

By: *_/s/ Daniel P. Griffin_*
Daniel P. Griffin
Georgia Bar No. 310760
dgriffin@griffindurham.com
75 14th Street, Suite 2250
Atlanta, GA 30309
Ph/Fax: 770-954-7813

*_/s/ Joshua A. Mayes_*
Joshua A. Mayes
Georgia Bar No. 143107
jmayes@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, NW
Atlanta, Georgia 30318
Telephone: (678) 701-9381

Facsimile: (404) 856-3250

*Attorneys for Defendant Bradford*

**CERTIFICATE OF SERVICE**

On this date, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

This 7th day of August, 2026.

**GRIFFIN DURHAM TANNER & CLARKSON LLC**

By: */s/ Daniel P. Griffin*
Daniel P. Griffin
Georgia Bar No. 310760
dgriffin@griffindurham.com
75 14th Street, Suite 2250
Atlanta, GA 30309
Ph/Fax: 770-954-7813

*Attorney for Defendant Bradford*